# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Tremaine Nelms, *et al.*,

      Plaintiffs,

                                  **Case No.: 2:08-cv-1038**
                                  **JUDGE SMITH**
      v.                           **Magistrate Judge Abel**

Wellington Way Apartments, LLC, *et al.*,

      Defendants.

### OPINION AND ORDER

Plaintiffs Tremaine Nelms and Kaylen Alli[1] bring this action against Defendants Wellington Way Apartments, LLC ("Wellington Way Apartments"), Thomas Lagos, Tina Lagos, and Shirley Moreland (the "Wellington Way Defendants"); and Defendants the City of Columbus, Columbus Police Officer Michael Fleming, and Columbus Police Officer Lowell Whitt ("the Columbus Defendants"), claiming housing discrimination and an unlawful search. This matter is before the Court on Defendants' Motions for Summary Judgment (Docs. 30 and 32). For the reasons that follow, the Court **GRANTS** both sets of Defendants' Motions for Summary Judgment.

### I. BACKGROUND

---

[1] Because he was 17 years old when the complaint was filed, Plaintiff Alli's claims were originally brought on his behalf by his mother (who is also Plaintiff Nelms' mother), Tammy Stewart. As Plaintiff Alli has attained the age of majority during the pendency of this case, Tammy Stewart has been dropped as a party, and Plaintiff Alli therefore remains as a party, pursuing his claims on his own. (*See* Doc. 28).

This case arises from the entry and search of Plaintiff Nelms' apartment on April 9, 2007, and Wellington Way Apartments' termination of his apartment lease.  Defendants Fleming and Whitt allegedly entered and searched Plaintiff Nelms' apartment in violation of his constitutional rights, and an employee of Wellington Way Apartments allegedly entered the apartment without reasonable notice or consent in violation of Ohio law.  Furthermore, the Wellington Way Defendants allegedly discriminated against Plaintiff Nelms and Plaintiff Alli on account of their race and Plaintiff Nelms' disability.  The facts of this case are detailed below.

A.      Plaintiff Nelms Moves Into Apartment at 4400 Shoupmill

Plaintiff Nelms is "borderline intellectual functioning," and, in October 2006, he was diagnosed with "schizo-affective disorder," a condition that causes paranoia.  (Stewart Dep., p. 20-23).  Before July 2006, Plaintiff Nelms resided with his mother, Ms. Stewart, and younger brother, Plaintiff Alli, at his mother's apartment, which was located a short walk from the Wellington Way Apartments.  On July 1, 2006, Plaintiff Nelms moved to 4400 Shoupmill Drive, Columbus, Ohio (4400 Shoupmill), an apartment in the Wellington Way Apartments complex. The Wellington Way Apartments complex was at all relevant times owned by Defendant Thomas Lagos.  Mr. Lagos is married to Defendant Tina Lagos, and owns the apartment complex independent of her.  Defendant Shirley Moreland is the property manager at the apartment complex.  Plaintiff Nelms' brother, Plaintiff Alli, would visit his brother at Plaintiff Nelms' apartment everyday during his residency at 4400 Shoupmill, often with a group of friends.  When visiting, they would make and listen to music.

B.      Complaints Regarding 4400 Shoupmill

In March 2007, Defendant Moreland began to receive complaints regarding Plaintiff Nelms and the people visiting his apartment.  There were complaints concerning how these persons walked through the Wellington Way Apartments property and complaints concerning noise coming from Plaintiff Nelms' apartment.  In particular, other residents complained that these visitors were walking too close to the apartments and that they were disturbing them with noisy conduct, including playing music too loud.  Jeff Cohen, who resided at the Wellington Way Apartment complex and in close proximity to 4400 Shoupmill, has testified that, "[p]rior to and during March, 2007" he observed "a lot of people going in and out of 4400 Shoupmill," that "[t]here were loud noises on numerous occasions coming from the apartment," and that the activity would continue "at all hours of the night." (Cohen Aff., ¶ 2).  Mr. Cohen claimed he could hear the music from 4400 Shoupmill while inside his apartment with the windows closed.  Mr. Cohen further testified that groups of people would gather outside the apartment and would be "disrespectful" and "would make derogatory comments to" him.  *Id.*  On one occasion, Mr. Cohen "heard a loud female voice coming from the patio at 4400 Shoupmill Drive, Columbus, Ohio.  She was swearing and being insulting." *Id.*

Defendant Moreland informed Defendant Thomas Lagos about the complaints she received about the tenant at 4400 Shoupmill, including that individuals visiting the apartment were walking too close to the doors and windows of other tenants' apartments and that loud music was emanating from 4400 Shoupmill at all hours, disturbing other tenants.  Upon receiving these reports, he instructed her to send a thirty-day notice of termination of tenancy to the tenant causing the disturbance.  At the time, Thomas Lagos had never met either Plaintiff, and he did not know their race or that Plaintiff Nelms has a disability.  In response to the lease termination letter,

3

Plaintiffs' mother, Ms. Stewart, contacted the Columbus Urban League, an organization dedicated to eliminating racism. Ms. Stewart contacted the organization for assistance because she believed that the lease termination was racially discriminatory.

C.      April 9, 2007 Incident

Shortly before 6 p.m., on April 9, 2007, Ann Bullock, a cleaning woman employed by Wellington Way Apartments, called Ms. Moreland and reported a disturbance at 4400 Shoupmill. Ms. Bullock reported that four people exited the apartment and one person got pushed into a fence, knocking down the fence. When Ms. Moreland received the call from Ms. Bullock, Tina Lagos was present in the apartment complex's management office. At Ms. Lagos' urging, Ms. Moreland called the police. After calling the police, Ms. Lagos and Ms. Moreland proceeded to 4400 Shoupmill. Ms. Lagos informed Steve Shump, the apartment complex's maintenance man, of the problem, and he also went to the apartment.

Defendants Fleming and Whitt, who were working patrol duty for the Columbus Division of Police, were dispatched to the Wellington Way Apartment complex on a call of property destruction in progress.[2] Upon their arrival at the scene, Defendants Fleming and Whitt observed the presence of three or four teenagers and three adults near 4400 Shoupmill. They also observed damage to the fence located to the left of the apartment door. The adults, Ms. Lagos, Ms. Bullock, and Mr. Shump, first spoke with the police. The adults informed the officers that there had been a fight in front of the apartment, which resulted in the damage to the fence. The officers did not witness any struggle, and they asked who was involved in the altercation. The adults

---

[2] Sometime prior to April 9, 2007, Defendant Moreland told Defendant Whitt, who regularly patrolled the area, that there was a drug problem at the apartment complex, but she did not identify any particular resident or apartment that was involved.

were not sure who had been involved in the fight, but expressed concern that one of the participants was inside the apartment.

The officers attempted to interview the teenagers but they were not forthcoming with information other than possibly indicating to the officers that they had been play fighting. Neither officer observed any bruises or other marks on the teenagers indicating they had been in a fight. The teenagers were placed in the police cruisers during the investigation of the situation. According to Plaintiff Alli, one of the teenagers, "Anthony," was "wrestled down to the ground" before being placed in a cruiser. (Alli Dep., p. 30). Plaintiff Nelms testified that, from inside the apartment, he witnessed an officer "thr[ow] [Anthony] to the ground," and that this scared him, causing him to remain in his apartment and hide. (Nelms Dep., p. 51-52).

Tina Lagos expressed concern to the officers about the well-being of the tenant in the apartment and the possibility of further property damage inside the apartment. Also, Officer Fleming and Ms. Lagos told Columbus Police Sergeant Dennis Weyandt, during the police's subsequent internal investigation, that Ms. Lagos commented to the officer that the apartment was a "drug house," and that she was concerned that someone could have been in the apartment "hiding stuff." (Weyandt Dep., pp. 63, 140). In response to Ms. Lagos' statements, Officer Fleming asked Ms. Lagos about the landlord's ability, pursuant to the lease, to enter the apartment due to possible property damage.

Based on his assessment of the situation, Officer Fleming decided to knock on the door of the apartment. Even though Plaintiff Nelms was inside the apartment when the police arrived at the scene, he did not respond to the knocking. He locked the door to the apartment when he saw the police in the area, and at first hid in a closet. When he exited the closet, he observed an

officer at the door to the apartment, and then hid in the bathroom.  The fully clothed Plaintiff Nelms climbed into the bath tub and shut the shower curtain.  (Nelms Dep., pp. 59-62).

After receiving no response to the knocking on the apartment door, Officer Fleming decided to enter the apartment to search for a possibly injured person.  Ms. Lagos obtained a key from Mr. Shump, and opened the apartment door.[3]  Officer Fleming announced his presence and then entered the apartment.  He found no one in the front living area, in the open closet, or in the bedroom.  When he entered the bathroom and opened the shower curtain he found Plaintiff Nelms, fully clothed.  According to Officer Fleming, he determined that Plaintiff Nelms was not injured or the victim of any crime.  After he made this determination, he exited the apartment without conducting any other search.  (Fleming Aff., ¶ 27).  Officer Whitt testified that he never entered Plaintiff Nelms' apartment.  (Whitt Aff., ¶ 13).  The police told Ms. Lagos that no arrests would be made, and she gave each of the non-resident teenagers a trespass warning.

Contrary to the officers' testimony, Plaintiffs Alli testified that both officers entered the apartment, and both Plaintiffs testified that the officers' search in the apartment went beyond looking for an injured person.[4]  Plaintiff Nelms testified that, after Officer Fleming found him in the shower, this officer asked him if he had "anything illegal" in the apartment, and told him, "if I

---

[3] According to testimony of Plaintiffs Nelms and Alli, Mr. Shump entered and exited the apartment before any officer entered.  Officer Fleming has testified that he had no knowledge of whether Mr. Shump had already entered the apartment before the officer decided to enter the apartment.

[4] Additionally, Plaintiff Nelms alleges that Officer Fleming pointed a gun at him when he was discovered in the shower.  Plaintiff Nelms testified that Officer Fleming pointed a gun at him and then a Taser, after he holstered the gun.  But the issue of whether Officer Fleming pointed a gun at Plaintiff Nelms, and not just a Taser as asserted by Officer Fleming, is a non-issue because Plaintiff Nelms does not assert a claim of excessive force.

6

find anything in here, you['re] going to jail." (Nelms Dep., pp. 69-70). Plaintiff Nelms testified that he witnessed Officer Fleming subsequently "[g]oing in [Nelms'] cabinets and stuff," and opening a "little cupboard." *Id.* at 70-71. Plaintiff Nelms further testified that, after he was placed in a police cruiser, Officer Fleming indicated to him that he was going back into the apartment to search. When the officer returned to Plaintiff Nelms, "He said he didn't find nothing in the apartment" other than a Bible on a table. *Id.* at 80. Plaintiff Nelms testified that he only remembered one officer being in his apartment. *Id.* at 72-73.

Plaintiff Alli testified that he saw both officers enter the apartment, and that he could view the living room area of the apartment from the backseat of the police cruiser. Plaintiff Alli also testified as to what he saw after the officers entered the apartment: "One officer goes around to the corner – I don't know exactly where he goes, but he goes around the corner. While the other cop is flipping through cushions, he lifts it up, flipping through them, trying to find whatever he could find." (Alli Dep., p. 38). Plaintiff Alli further testified that this officer was "searching through the couches" for "two to three minutes." *Id.* at 39-40. The couch was in the living room, "right in front of the door." *Id.* at 38. According to Plaintiff Alli's testimony, the officer who was not searching the couches brought Plaintiff Nelms into the living room, where he remained for about one minute.

D.     Internal Investigation Conducted by Division of Police

On April 13, 2007, Plaintiffs' mother, Ms. Stewart, filed a complaint with the Columbus Division of Police, alleging that the police had illegally entered Plaintiff Nelms' apartment on April 9, 2007. Columbus Police Sergeant Dennis Weyandt immediately conducted an internal investigation of the matter, including interviewing Plaintiffs and Defendants Fleming and Whitt in

the weeks following the incident, and determined that the officers had acted within the guidelines of the police department's policies and procedures. Sergeant Weyandt's immediate supervisors agreed that no action was needed on the complaint because exigent circumstances warranted the entry into the apartment. Columbus Police Commander Jeffrey Blackwell, however, concluded that Officer Fleming's entry into Plaintiff Nelms' apartment violated the police department's policies and procedures based on his conclusion that there were no exigent circumstances justifying a forced entry. Finally, Deputy Chief Rockwell disagreed with Commander Blackwell's conclusion, and determined that Officer Fleming's conduct was within the department's policies and procedures because the landlord had provided consent for the entry.

E.     Plaintiff's Lease is Terminated

Defendant Thomas Lagos was not present or involved in the April 9, 2007 incident. Ms. Lagos subsequently told Mr. Lagos about the April 9, 2007 incident, and specifically informed him that individuals had damaged a fence as a result of horseplay or a fight. As a result of learning about the April 9, 2007 incident, Mr. Lagos instructed Ms. Moreland to terminate the lease of any tenant who was associated with, or involved in, the altercation and property damage at the apartment. He also instructed her to terminate the lease of any other tenants who were involved in "run-ins with the police." (Thomas Lagos Aff., ¶ 4). By letter dated March 26, 2007, and pursuant to Mr. Lagos' previous instruction, Plaintiff Nelms was notified that his lease was being terminated, effective April 30, 2007. (Moreland Dep., Ex. 2). Plaintiff Nelms vacated the apartment at the end of April or early May 2007.


F.     Plaintiffs Initiate this Action

8

Plaintiffs initiated this lawsuit in the Franklin County, Ohio, Court of Common Pleas, and the Columbus Defendants removed the case to this Court.  Both Plaintiffs assert claims of housing discrimination and interference in violation of federal law, and an unlawful search in violation of the Fourth Amendment.  Plaintiff Nelms also claims that the Wellington Way Defendants entered his apartment in violation of Ohio Revised Code § 5321.04(A)(8).  All Defendants have moved for summary judgment.  The summary judgment motions have been fully briefed and they are ripe for disposition.

## II.  STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides:

> The judgment sought shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party.

9

*Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*,  570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has the duty to search the entire record to establish

10

that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

It is with these principles in mind that the Court addresses Defendants' motions for summary judgment.

## III.    DISCUSSION

A.    The Columbus Defendants Motion for Summary Judgment

The Columbus Defendants argue that they are entitled to summary judgment on all the claims filed against them in this action.  More particularly, the Columbus Defendants argue that there exists no genuine issue of material fact as to Plaintiff Nelms' claims of unlawful entry and search against Defendants Fleming and Whitt.  The Columbus Defendants argue that neither Defendant Fleming nor Defendant Whitt violated Plaintiff Nelms' constitutional rights, and they are entitled to qualified immunity.  As to Defendant Fleming, the Columbus Defendants argue that this officer's entry into and search of Plaintiff Nelms' apartment was not unconstitutional in view of the totality of the circumstances, and that even if the entry and search was unconstitutional, he is entitled to qualified immunity because his conduct was objectively reasonable in light of the facts and circumstances.  As to Defendant Whitt, the Columbus Defendants argue that this officer never entered or searched Plaintiff Nelms' apartment, and therefore is entitled to judgment as a matter of law.  Lastly, the Columbus Defendants argue that the City of Columbus is not liable for any illegal search because there is no evidence that the municipality caused the alleged constitutional violation.

Plaintiffs argue that there were no exigent circumstances that would have permitted the officers to search Plaintiff Nelms' apartment, and therefore the search violated the Fourth Amendment, and that, even if exigent circumstances existed, the officers' conduct while inside Plaintiff Nelms' apartment violated his Fourth Amendment rights.  In addition, Plaintiffs argue that the officers are not entitled to qualified immunity because the right that was violated is clearly established and the officers' conduct was unreasonable in light of that right.  Plaintiffs also argue that the City of Columbus is liable because the Division of Police was operating under an unwritten, but overriding, policy that allows officers to enter a tenant's residence with a landlord's permission.

### 1.    Claims Against Defendants Fleming and Whitt

Plaintiffs allege that Defendants Fleming and Whitt violated Plaintiff Nelms' Fourth Amendment rights by unlawfully entering and searching Plaintiff Nelms' apartment.  Plaintiffs originally brought these claims under both 42 U.S.C. §§ 1983 and 1985, but are no longer pursuing a conspiracy claim under § 1985.[5]  Furthermore, although Plaintiffs' Complaint suggests that Plaintiff Alli was alleging a claim against the Columbus Defendants under § 1983, any such claim has been abandoned, as their memorandum in response to the Columbus Defendants' Motion for Summary Judgment focuses solely on the alleged violation of Plaintiff Nelms' rights. *See Rakas v. Illinois*, 439 U.S. 128, 133 (1978) (noting that Fourth Amendment rights are personal rights, which may not be vicariously asserted).

### a.    Section 1983 and the Fourth Amendment

---

[5] *See* Document 47, p. 27 n.19 ("Plaintiffs are no longer pursuing a conspiracy claim under 42 U.S.C. § 1985.").

Plaintiff Nelms seeks relief under 42 U.S.C. § 1983 for alleged violations of his Fourth

Amendment rights.  Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress [ ... ]

42 U.S.C. § 1983.  This statute " 'is not itself a source of substantive rights,' but merely provides

'a method for vindicating federal rights elsewhere conferred.' "  *Graham v. Connor*, 490 U.S.

386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To state a

claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant (1) acted under color of

state law to (2) deprive the plaintiff of a right secured by the constitution or a federal statute.

*Cassady v. Tackett*, 938 F.2d 693, 695 (6th Cir. 1991).  There is no dispute that Defendants

Fleming and Whitt were acting under color of state law when they investigated the situation at

Plaintiff Nelms' apartment on April 9, 2007.  The parties dispute whether these officers deprived

Plaintiff Nelms of his Fourth Amendment rights.

Under the Fourth Amendment, made applicable to the States by the Fourteenth

Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), the people are "to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend.

IV.  Warrantless searches are presumptively unreasonable under the Fourth Amendment, "subject

only to a few specifically established and well delineated exceptions."  *Minnesota v. Dickerson*,

508 U.S. 366, 372 (1993).  The existence of exigent circumstances is one of the exceptions to the

warrant requirement.  *See Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) ("[t]he need to

protect or preserve life or avoid serious injury is justification for what would be otherwise illegal

13

absent an exigency or emergency") (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).  For example, "the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Mincey*, 437 U.S. at 393-94.  The Sixth Circuit has recognized four general categories that satisfy the exigent circumstances exception:  (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others.  *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996).

Under the "risk of danger" exigency, law enforcement officers "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392.  "Police have a right and a duty to respond to emergency situations." *Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003).  This emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. *Michigan v. Fisher*, 130 S.Ct. 546, 548 (2009).  However, the law enforcement officers must have an objectively reasonable basis for believing that an occupant is in need of immediate aid.  *Id.* (citing *Mincey*, 437 U.S. at 393-94).  Ultimately, in reviewing whether exigent circumstances were present, courts must consider the "totality of the circumstances and the inherent necessities of the situation at the time." *Ziegler v. Aukerman* 512 F.3d 777, 785 (6th Cir. 2008) (quoting *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)).

b.    Qualified Immunity

14

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).   To defeat a claim of qualified immunity, a plaintiff must show: (1) the facts viewed in the light most favorable to the plaintiff show that a violation of the plaintiff's constitutional rights occurred and, (2) the constitutional right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part on other grounds* by *Pearson v. Callahan*, 555 U.S. 223 (2009).  Thus, government actors are shielded from liability if they establish either that (1) the plaintiff's allegations fail to make out a violation of a constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct.  *See Pearson*, 129 S.Ct. at 815-16.  Courts have discretion, based on the circumstances of the case, to decide which of the two inquiries should be addressed first. *Pearson*, 129 S.Ct. at 818.

In analyzing claims of qualified immunity, the court may also assess whether "the plaintiff [has] offered sufficient evidence to indicate that what the official allegedly did was objectively

unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005). While this additional inquiry is no longer mandatory, *see Carter*, 408 F.3d at 311, in some cases it may be a useful tool in increasing the "clarity of the proper analysis." *Id.*

When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to decisions of the United States Court of Appeals for the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). Furthermore, for a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were lawful. *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). Qualified immunity " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). Therefore, the protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 129 S.Ct. at 815 (quoting *Groh v. Ramirez*, 540 U.S. 551,

567 (2004) (Kennedy, J., dissenting)).

> c.      Analysis

The Court will therefore determine whether Plaintiff Nelms can establish a violation of these constitutional rights, and if such rights were clearly established.

> (1)      Entry and Search of Apartment

It is clearly established law that a "warrantless search [or entry] by the police is invalid unless it falls within one of the narrow well-delineated exceptions to the warrant requirement," *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999), and that exigent circumstances constitute one of the exceptions to the warrant requirement. *See Mincey*, 437 U.S. at 392-93. Furthermore, a reasonable person would have known that the "scope of [a] search is limited by the terms of its authorization." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 550 (6th Cir. 2003) (quoting *Walter v. United States*, 447 U.S. 649, 657 (1980)). Thus, "[w]hile exigent circumstances may justify police conduct that would otherwise be unreasonable if undertaken without a warrant, such conduct must be strictly circumscribed by the exigencies which justify its initiation." *Segura v. United States*, 468 U.S. 796, 823 (1984) (quotation omitted).

Defendants Fleming and Whitt were dispatched to the Wellington Way Apartment complex on a call of property destruction in progress. Upon their arrival at the scene, the officers were informed that some type of fight had occurred prior to their arrival and that someone involved in the fight may have taken refuge in the apartment at 4400 Shoupmill. Even though the officers did not see any struggle, they observed damage to the fence just outside the entrance to this apartment. The teenagers, who reasonably would have the most information regarding exactly what had occurred and who was involved, were not particularly helpful to the officers in

17

their investigation. They did not provide any information other than informing the officers that they had been play fighting. Concerned for the safety and well-being of the potential victim, Officer Fleming knocked on the door of the apartment, to which he received no response. The officer decided to enter the apartment to search for the possibly injured person, and he ultimately found Plaintiff Nelms, fully clothed and standing in the shower, with the curtain drawn.

The circumstances encountered by the defendant officers necessitated immediate action. Upon their arrival at the apartment complex on a call of property destruction, the officers took the necessary and appropriate steps to gather information and assess the situation. The officers were faced with many uncertainties. They investigated and processed the scene, and received some information from the apartment complex employees. The teenagers at the scene, however, were generally uncooperative. The officers had reason to believe that one of the persons in the fight was in the apartment and the other was outside the apartment. The teenagers apparently indicated that they had been play fighting, but their lack of cooperation, the damage to the fence, and the information that a victim may have been inside the apartment, reasonably necessitated further action by the officers. Based on the totality of the circumstances, Officer Fleming reasonably believed that a person inside the apartment was seriously injured and unable to respond. This risk of danger constituted exigent circumstances justifying the warrantless entry and search. Therefore, Officer Flemings' entry into Plaintiff Nelms' apartment was constitutional. For these same reasons, if Officer Whitt entered the apartment, as alleged by Plaintiffs, his entry was also constitutional. Defendants Fleming and Whitt are therefore entitled to qualified immunity because Plaintiff Nelms has failed to prove a violation of his constitutional rights. Further, Plaintiffs fail to show that no reasonably competent official would have concluded that the actions taken were

18

lawful.

### (2) Scope of Search in Apartment

Plaintiffs' primary arguments against the Defendant Officers center on whether the officers lawfully entered the apartment.  However, Plaintiffs devote one paragraph in their argument section of their brief to argue that, even if exigent circumstances existed, the scope of the officers' search in the apartment exceeded what was authorized based on those exigencies.[6]  In support, Plaintiffs cite their own testimony indicating that both officers entered the apartment and conducted a search beyond looking for a person, which conflicts with Officer Whitt's testimony that he never entered Plaintiff Nelms' apartment, and Officer Fleming's testimony that he did not conduct any search within Plaintiff Nelms' apartment other than looking for an injured person.  In accord with the officers' testimony, Defendants do not assert that they were authorized to conduct a search within the apartment beyond looking for the possibly injured person.

Plaintiff Alli testified that, from the back of the police cruiser, he saw both officers enter the apartment, and that he could view the living room area of the apartment.  Plaintiff Alli described the circumstances as follows:  "One officer goes around to the corner – I don't know exactly where he goes, but he goes around the corner.  While the other cop is flipping through cushions, he lifts it up, flipping through them, trying to find whatever he could find."  (Alli Dep., p. 38).  Plaintiff Alli further testified that this officer was "searching through the couches" for "two to three minutes."  *Id.* at 39-40.  The couch was in the living room, "right in front of the

---

[6] In response to the officers' summary judgment motion, Plaintiff Nelms also argues that he was unlawfully seized.  But Plaintiff did not plead unlawful seizure, and a party may not raise a new claim at the summary judgment stage.  *See, e.g.*, *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788-89 (6th Cir. 2005).

door." *Id.* at 38.  According to Plaintiff Alli's testimony, the officer who was not searching the couches brought Plaintiff Nelms into the living room, where he remained for about one minute. Plaintiff Nelms testified that, after Officer Fleming found him and sat him on the couch, the officer continued to search the apartment by opening cabinets and a small cupboard.  Plaintiff Nelms further testified that, after he was placed in a police cruiser, Officer Fleming returned to the apartment to conduct an additional search.  In his testimony, Plaintiff Nelms does not make any reference to Officer Whitt.

Plaintiff Alli's testimony is belied by the undisputed fact that he was sitting in the back of a police cruiser during the search.  Photographs of the apartment that have been submitted demonstrate that Plaintiff Alli's view of the inside of the apartment would have been limited, even if the door of the apartment was left open.  (Stewart Dep., Ex. 2).  And, even if Plaintiff Alli's view was not limited, an audio recording, submitted as an exhibit by Plaintiffs, indicates that when he spoke with Sergeant Weyandt on April 20, 2007, as part of the police department's investigation, he told Sergeant Weyandt that the officers searched the apartment "for [Plaintiff Nelms] . . .um, or whatever . . .  and, when they found him, they stopped . . . their search." (Weyandt Dep., Ex. 4).  While Plaintiff Alli's use of the word "whatever" could literally be viewed as suggesting that the officer searched for something other than a person, in context, it reflected uncertainty or deliberation as what to say next.  Significantly, Plaintiff Alli did not otherwise suggest that the officers' search went beyond looking for Plaintiff Nelms.  For example, he did not tell Sergeant Weyandt that an officer searched a couch in the apartment before his brother was found.

Although Plaintiff Nelms testified that Defendant Fleming continued to search in the

apartment after he was found, this assertion is not otherwise substantiated by the record, and Plaintiff Nelms admittedly suffers from a mental condition that causes paranoia. Officer Fleming testified that his search was limited to looking for an injured person, and his testimony is supported by Ms. Lagos' testimony that, after Officer Fleming found Plaintiff Nelms, he exited the apartment with Plaintiff Nelms and reported that no arrests would be made. Moreover, when Sergeant Weyandt interviewed Plaintiff Nelms on April 18, 2007, less than ten days after the incident, Plaintiff Nelms told Sergeant Weyandt that the police officer entered his apartment to search for him, but he did not say or even suggest that the officer conducted an additional search or extended the search beyond looking for him. (Weyandt Dep., Ex. 4).

The Court recognizes that it cannot weigh credibility when ruling on a summary judgment motion. However, based on the evidence submitted, no reasonable jury could find that the officers conducted a search beyond that necessary based on the circumstances presented. *See Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (holding that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately rely on contrary evidence presented by the defendants to conclude, at the summary judgment stage, that no reasonable jury would credit the plaintiff's testimony). Plaintiffs' self-serving testimony that the officers searched the apartment in a manner inconsistent with searching for an injured person is contradicted, or is at least inconsistent with, the version of the incident described by all the other witnesses. Furthermore, there is no evidence of actual harm that would substantiate the allegations, and Plaintiffs did not mention this alleged conduct when they talked with the investigating officer within days of the incident. No rational jury would credit the Plaintiffs' testimony on this issue.

Accordingly, Defendants Fleming and Whitt are entitled to summary judgment on Plaintiff Nelms' § 1983 claim against them.

>       2.      Claim Against the City of Columbus

Plaintiff Nelms alleges that Defendant City of Columbus is liable for unconstitutional actions of Defendants Fleming and Whitt due to inadequate training or supervision.  Defendants argue that Plaintiff Nelms is unable to present evidence that he endured a constitutional deprivation and that the City of Columbus has a policy, custom, or practice that caused the deprivation.

To establish municipal liability under section 1983, the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the city was responsible for that violation.  *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009) (citing *Cash v. Hamilton County Dept. of Adult Prob.*, 388 F.3d 539, 542-43 (6th Cir. 2004)).  Municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an "implementation of [the municipality's] official policies or established customs."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J., concurring).  Thus, a municipality cannot be held liable in section 1983 actions on a *respondeat superior* theory.  *Id.* at 691.  "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.  The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (internal citations omitted).

To support a claim for municipal liability on the basis of an unwritten policy of tolerating

federal rights violations, a plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity];
>
> (2) notice or constructive notice on the part of the [defendant];
>
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  The presence of a custom or policy that is unconstitutional cannot be established by evidence of a single instance of allegedly unconstitutional conduct. *Lausin ex rel. Lausin v. Bishko*, 727 F. Supp.2d 610, 637 (N.D. Ohio July 15, 2010) (citing *Thomas*, at 433, and *Peet v. City of Detroit*, 502 F.3d 557, 567-68 (6th Cir. 2007)).  "A custom or policy must be shown by 'a clear and persistent pattern,' and three discrete instances in one investigation is simply not enough to reasonably draw such a conclusion."  *Peet*, at 568.

Plaintiff Nelms argues that City of Columbus policies permitted a violation of his rights. However, it is the official Columbus Division of Police policy that an officer may conduct a warrantless search in an emergency situation if there is a reasonable belief that the action is necessary to "preserve life and limb or to provide immediate aid to involved person(s)."  (Doc. 30-1).  The policy statement also provides that "Once the actual emergency is alleviated and the danger associated with it has been relieved, the authority to search without a warrant terminates." *Id.*  Furthermore, it is undisputed that the Columbus Division of Police written policies do not permit an officer to enter a tenant's residence based on a landlord's consent, which is consistent with established United States Supreme Court precedent indicating that a landlord generally does

23

not possess authority to grant consent to the search of a tenant's private residence.  *Chapman v. United States*, 365 U.S. 610, 616 (1961); *U.S. v. Kimber*, 2010 WL 3521937, *5 n.8 (6th Cir. Sept. 2, 2010) (citing *Chapman*); *Wilhelm v. Boggs*, 290 F.3d 822, 826 (6th Cir. 2002) (same).

Plaintiff Nelms argues that, even though the Columbus Division of Police's written policies do not permit an officer to enter a tenant's residence with a landlord's consent, evidence demonstrates that the Columbus Division of Police has been operating under an unwritten and overriding policy allowing officers to enter a tenant's residence with a landlord's permission.  In support of this argument, Plaintiff Nelms cites evidence indicating that Officer Fleming questioned Tina Lagos regarding provisions in the lease before he entered Plaintiff Nelms' apartment, and evidence of statements made by Columbus Police Sergeant Weyandt and Columbus Policy Deputy Chief Rockwell during the post-incident internal affairs investigation.  Tina Lagos testified that an officer asked her if the lease allowed the landlord to enter an apartment, and that she told the officer that the landlord could enter the apartment in an emergency.  During the internal investigation of the incident, Sergeant Weyandt told Tammy Stewart that an officer may enter a tenant's residence, at the request of a landlord, to see if someone is destructing the property. Also during the internal investigation, Deputy Chief Rockwell wrote that entering under the landlord's authority has generally been upheld by the courts.

Plaintiffs argue that this evidence "reflects a systemic failure by the CPD to ensure that tenant's constitutional rights are respected."  (Pls.' Mem. Contra, at 32).  To the contrary, the evidence does not demonstrate a clear and persistent pattern of unconstitutional conduct.  Nor does it demonstrate the existence of an unconstitutional policy at the time of the incident.  That Deputy Chief Rockwell and Sergeant Weyandt misstated the law in a post-incident investigation

does not mean that there existed an unwritten policy that superceded the written policy, or that there existed an unwritten policy that was the "moving force" in any constitutional deprivation. Furthermore, evidence that Defendant Fleming requested information regarding the lease does not reasonably create an inference of the existence of an entrenched Columbus Division of Police policy to enter tenant's residences simply based on the consent of the landlord, nor does it demonstrate that Defendant Fleming entered the apartment on the basis of any such policy. Therefore, the Court finds that Plaintiffs have failed to support their claim of municipal liability against the City of Columbus.  Accordingly, the City of Columbus is entitled to summary judgment.

   B.     The Wellington Way Defendants Motion for Summary Judgment

   The Wellington Way Defendants argue that they are entitled to summary judgment because Plaintiffs cannot demonstrate that a genuine issue of material fact exists as to any of their claims against these Defendants.  Plaintiffs argue that they have presented a *prima facie* case of discrimination and retaliation under the Fair Housing Act, that evidence demonstrates that Defendant Tina Lagos conspired with Defendant Fleming to violate Plaintiff Nelms' Fourth Amendment rights, and that evidence demonstrates that the Wellington Way Defendants violated Ohio Revised Code § 5321.04(A)(8).

   1.     Fair Housing Act Claims Against Wellington Way Defendants

      a.     Discrimination Claims

Plaintiffs allege that the Wellington Way Defendants violated 42 U.S.C. § 3604 (§ 804 of

25

the Fair Housing Act).  Section 3604 provides in pertinent part that it is unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.
>
> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of--
>
> (A) that buyer or renter,
>
> * * *
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--
>
> (A) that person[.]

The analysis applied to federal fair housing discrimination claims turns on the three-part evidentiary standard first developed in the employment discrimination context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) (citing *Mencer v. Princeton Sq. Apartments*, 228 F.3d 631, 634 (6th Cir. 2000)).  First, the plaintiff must present evidence from which a reasonable jury could conclude that there exists a *prima facie* case of housing discrimination.  *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007); *Mencer*, 228 F.3d at 634.  If the plaintiff is successful, the burden shifts to the defendant to offer "evidence of a legitimate, nondiscriminatory reason for" the adverse housing decision.  *See Blair*; *Mencer*, 228 F.3d at 634.  If the defendant carries his burden, the burden shifts back to the plaintiff to "identify evidence from which a reasonable jury could conclude that

26

the proffered reason is actually a pretext for unlawful discrimination." *See Blair*; *Mencer*, 228 F.3d at 634.

The Sixth Circuit Court of Appeals has held that, in order to establish a *prima facie* case of housing discrimination on the basis of race, the plaintiff must show that: (1) the plaintiff is a member of a racial minority; (2) he or she applied for and was qualified to purchase certain property or housing; (3) he or she was rejected; and (4) the housing remained available thereafter. *Mencer*, 228 F.3d at 634. To show the second and third elements of this test in the case at bar, Plaintiff Nelms must show that he was renting an apartment and that the lease was terminated by the landlord (the adverse action). Also, to satisfy the first three elements of the *McDonnell Douglas prima facie* case, the plaintiff cannot merely allege that he suffered adverse action. *See Lindsay*, 578 F.3d at 417 ("[A] plaintiff cannot carry the *prima facie* burden for showing housing discrimination merely by offering evidence that he was a qualified minority purchaser whose competitive offer for a property was rejected."). The plaintiff must present evidence of something "more." *Id.* The something "more" or "additional evidence" typically consists of favorable treatment for similarly-situated individuals not within the plaintiff's protected group. *Id.* A plaintiff can refute the defendant's nondiscriminatory reason for adverse action "by showing that the proffered reason (1) has no basis in fact (i.e. did not actually occur), (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

If the alleged discriminator had no knowledge of the plaintiff's race, then the plaintiff cannot demonstrate a discriminatory intent on the basis of race. While *McDonnell Douglas* does not expressly state that the alleged discriminatory actor must have knowledge of the plaintiff's

minority status, the *McDonnell Douglas* test, however, "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence . . . on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978). Thus, an inference of intentional discrimination would not be rational if there is no direct or indirect evidence that the decision-maker had knowledge of the plaintiff's race. *See Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) ("the *McDonnell Douglas* elements would not rationally create this inference [of intentional discrimination] if, as here, a plaintiff offers proof that he is Black, but there is no showing by direct or indirect evidence that the decision-maker knew this fact.").

As to a tenant's housing discrimination claim based on a disability, the plaintiff must show: (1) that the plaintiff is disabled, (2) that the defendant knew of the disability, (3) the plaintiff's willingness to enjoy all rights available under the lease, and (4) the defendant's interference. *Bogdan ex rel. Terry v. Service Specialties, II, Inc. ex rel. Davis*, No. 05-72186, 2006 U.S. WL 1494951 (E.D. Mich. May 25, 2006).

The preliminary issue is whether Plaintiffs have demonstrated a *prima facie* case of housing discrimination against the Wellington Way Defendants. It is undisputed that Plaintiff Nelms, has a mental disability, is a member of a racial minority (African-American), was renting an apartment at the Wellington Way Apartment complex (4400 Shoupmill), his lease was terminated effective April 30, 2007, and the apartment remained available thereafter. Additionally, Plaintiffs assert that they have presented evidence demonstrating that Plaintiff Nelms was treated less favorably than his Caucasian neighbor.

The Wellington Way Defendants argue that Mr. Lagos, the owner of the apartment

28

complex, had no knowledge of Plaintiff Nelms' race or disability when he decided to terminate the lease. Plaintiffs do not challenge this assertion, but argue that it is inconsequential because Defendant Moreland, the property manager, knew Plaintiff Nelms' race and that he is disabled. Plaintiffs argue that Moreland's knowledge is significant because she managed the apartment complex and determined what information to give to Mr. Lagos.

It is unnecessary to resolve whether Plaintiff has presented a *prima facie* case, because, even assuming Plaintiff Nelms has presented a *prima facie* case of housing discrimination, evidence demonstrates that there was a legitimate, nondiscriminatory reason for Plaintiff Nelms' lease to be terminated. The Wellington Way Defendants have presented evidence that the juveniles who gathered at Plaintiff Nelms' apartment caused noise disturbances, intimidated and/or harassed tenants with derogative statements, and damaged apartment complex property. In March 2007, Defendant Moreland began to receive complaints regarding Plaintiff Nelms and the people visiting his apartment. Other residents complained that these visitors were walking unreasonably close to the apartments and that they were disturbing them with noisy conduct, including playing music too loud. There is also evidence that the noise would continue late into the night, and that visitors at 4400 Shoupmill would make disrespectful statements to residents.

Defendant Moreland informed Defendant Thomas Lagos regarding the complaints received about the tenant at 4400 Shoupmill. Mr. Lagos instructed Ms. Moreland to send a thirty-day notice of termination of tenancy to the tenant causing the disturbance. Later, after learning about the April 9, 2007 incident, Mr. Lagos instructed Moreland to terminate the lease of any tenant who was involved in the altercation and property damage at the apartment, and any other tenants who were involved in "run-ins with the police." (Thomas Lagos Aff., at ¶ 4).

29

Plaintiffs argue that the articulated reasons for the treatment of Plaintiffs are pretextual.  In support of this argument, Plaintiffs argue that the Wellington Way Defendant's explanation for why Plaintiff Nelms' lease was terminated has no basis in fact, and that, even if the reasons had a basis in fact, unlawful discriminatory intent was actually the basis for the adverse action.

As to their contention that the reasons given for terminating Plaintiff Nelms' lease had no basis in fact, Plaintiffs suggest that the evidence does not show that Plaintiff Nelms or his visitors were causing disturbances and other problems at the apartment complex.  But Plaintiffs fail to point to any evidence reasonably demonstrating that there were in fact no noise complaints concerning the apartment at 4400 Shoupmill, that the juveniles gathering at Plaintiff Nelms' apartment did not damage the fence outside his apartment, or that incidents involving disrespectful statements to tenants was not connected to individuals visiting his apartment. Plaintiffs simply have not shown that the reasons given for the termination of Plaintiff Nelms' lease are based on facts that did not actually occur.

Moreover, Plaintiffs fail to show that unlawful discriminatory intent was the basis for the termination of Plaintiff Nelms' lease, not the incidents that occurred at the 4400 Shoupmill apartment.  In this regard, Plaintiffs argue that the rationales for the lease termination decision changed, that the Wellington Way Defendants deviated from normal procedures when dealing with Plaintiff Nelms, that these defendants used statements of racial bias when deciding to terminate Plaintiff Nelms' lease, and that these defendants treated a similarly situated Caucasian tenant differently.  None of these arguments are persuasive.

A changing rationale for an adverse action can be evidence of pretext because it calls into question the credibility of the justifications. *See Cicero v. Borg-Warner Automotive, Inc.*, 280

F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question."). As stated by the Sixth Circuit, "a plaintiff may meet her burden of demonstrating pretext by showing, in addition to proffered evidence, that [a defendant's] reasons are so incoherent, weak, inconsistent, or contradictory that a rational jury could conclude the reasons were not believable." *Peck v. Elyria Foundry Co.*, 347 F. App'x 139, 147 (6th Cir. 2009). A notice of termination was sent to Plaintiff Nelms before the April 9, 2007 incident because of the complaints of other tenants regarding conduct at 4400 Shoupmill, including complaints of loud music and other disrespectful conduct. The April 9, 2007 incident, which involved fighting or horseplay that resulted in some property damage, confirmed the landlord's decision to terminate Plaintiff Nelms' lease. The fact that there were multiple factors contributing to the landlord's decision to terminate Plaintiff Nelms' lease does not demonstrate pretext. Plaintiffs' arguments to the contrary are unpersuasive. Simply stated, Plaintiffs cannot show that the reasons for terminating Plaintiff Nelms' lease is weak, incoherent, inconsistent, or contradictory.

Plaintiffs allege that Defendant Moreland deviated from procedures by not giving Plaintiff Nelms a warning or informing him of the complaints she had fielded from other tenants. According to Plaintiffs, the lack of warning demonstrates that the landlord was motivated to terminate Plaintiff Nelms' lease on the basis of his race and the race of his visitors. But there is no evidence of a required management procedure mandated by Mr. Lagos that a tenant be given a "warning" before a lease termination notice would be issued to a tenant. Plaintiffs' assertion that the absence of a formal warning was more likely a result of racial discrimination amounts to speculation, which does not create a genuine issue of fact. Furthermore, although evidence of the

31

failure to follow internal procedures can be evidence of pretext, "such a failure is, by itself, 'generally insufficient to support a finding of pretext[.]' " *Macy v. Hopkins Cty. School Bd. Of Educ.*, 484 F.3d 357 (6th Cir. 2007) (quoting *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)).

Plaintiffs allege that certain statements by Defendant Moreland and others reflected a racial bias. "[D]iscriminatory remarks may serve as evidence of pretext because they indicate the presence of animus toward a protected group." *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007). When assessing the relevancy of such remarks, courts look first to the identity of the speaker. *Nair v. Columbus State Cmty. Coll.*, No. 2:02-cv-595, 2008 WL 483333, *16 (S.D. Ohio Feb. 19, 2008) (Holschuh, J.). "Isolated discriminatory remarks made by individuals with no authority over . . . decisions are generally not probative, but remarks made by those who 'played a meaningful role . . . [or] may have influenced the [adverse] decision . . . may be relevant when the plaintiff challenges the motive behind that decision.' " *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). "Courts must also look to the substance of the comments, and their relationship to one another. . . .Isolated and ambiguous comments, as noted, usually do not support a finding of pretext." *Id.*

Plaintiffs assert that Defendant Moreland referred to those visiting Plaintiff Nelms' apartment as being in a "gang," that Defendant Tina Lagos called the apartment a "dope house," and that Defendant Moreland told Plaintiff Nelms that he and Plaintiff Alli had "changed the whole neighborhood . . . from a suburb into a ghetto." (Nelms Dep., pp. 129-32). Plaintiffs also cite statements of non-defendant residents in support of their argument of racial discrimination. Plaintiffs apparently seek to impute alleged racial animus of these tenants to the defendants.

32

Because Plaintiffs must show racially discriminatory intent on the part of the Wellington Way Defendants, Plaintiffs reliance on the statements of non-defendant tenants is unavailing. Additionally, the statements cited by Plaintiffs that were allegedly made by defendants in this action are largely ambiguous and reflect concern regarding the security and well-being of the neighborhood. Furthermore, although racial stereotyping remains prevalent in today's society, *see Buckeye Community Hope Foundation v. City of Cuyahoga Falls*, 263 F.3d 627, 636-37 (6th Cir. 2001), *overruled on other grounds by* 538 U.S. 188 (2003), these abstract statements do not create a reasonable inference that the landlord decided to terminate Plaintiff Nelms' lease on the basis of his race. Lastly, it is undisputed that Defendant Thomas Lagos made the final decision to terminate Plaintiff Nelms' lease, that this defendant was not aware of these remarks, and that there is no evidence of this defendant making any comments based on racial stereotypes.

Plaintiffs' argument that Plaintiff Nelms was treated less favorably than a Caucasian tenant is also unpersuasive. In essence, Plaintiffs argue that Plaintiff Nelms' conduct was insufficient to warrant the termination of his lease because a Caucasian tenant committed acts of comparable seriousness and received different treatment. Thus, according to Plaintiffs, the Wellington Way Defendants were actually motivated to terminate Plaintiff Nelms' lease because of his race, not because of any misconduct.

To demonstrate an insufficiency to motivate on this basis, the plaintiff must introduce evidence that the comparables are "similarly situated in all respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003). To be "similarly situated," the individual with whom the plaintiff seeks to compare his treatment must have "engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for it."
*Mitchell*, 964 F.2d at 583.

Plaintiff Nelms compares himself to his Caucasian next-door neighbor at the Wellington Way apartment complex, David Millard.  Plaintiff Nelms argues that even though Mr. Millard was responsible for major disturbances when he and his girlfriend had violent confrontations, Mr. Millard received different treatment than him.  But Defendant Moreland did not receive complaints from tenants concerning Mr. Millard even though she received complaints regarding the happenings at 4400 Shoupmill.  Furthermore, there is no evidence that Mr. Millard or his visitors damaged property of the apartment complex.  Individuals visiting Plaintiff Nelms on April 9, 2007, damaged property of the apartment complex.  These facts present differentiating and mitigating circumstances that distinguish Plaintiff Nelms from Mr. Millard.

Accordingly, the Court finds that the Wellington Way Defendants are entitled to summary judgment on Plaintiffs' claims of housing discrimination under the Fair Housing Act.

b.      Retaliation Claims

Plaintiff Nelms alleges that the Wellington Way Defendants retaliated against him because he engaged in protected activity, in violation of 42 U.S.C. § 3617 (§ 818 of the Fair Housing Act).  Section 3617 provides as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

To establish a *prima facie* case of retaliation under § 3617, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a

causal link exists between the protected activity and the adverse action. *Madison v. Philadelphia Housing Authority*, 2010 WL 2572952, *3-4 (E.D. Pa. June 23, 2010) (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)).  Regarding the first element of this test, the defendant necessarily must have known of the protected activity.  *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (identifying awareness of the protected activity as a fourth element in the *prima facie* analysis).  "Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.' "  *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*, 457 F. Supp.2d 126, 131 (E.D. N.Y. 2006) (quoting *Cruz v. Coach Stores*, 202 F.3d 560, 566 (2d Cir. 2000)).

Plaintiff Nelms asserts that he engaged in protected activity by exercising his right to live in his apartment without discrimination based on race and disability, and by going to the Columbus Urban League to seek assistance in filing a housing discrimination charge with the Ohio Civil Rights Commission.  The Wellington Way Defendants argue that Plaintiffs' retaliation claims are not supported by the evidence.

Preliminarily, the Court notes that Plaintiff Nelms was not engaging in a "protected activity," as that term is defined for the purpose of § 3617, by exercising his right to live in his apartment without discrimination.  Residing at his apartment was not an action taken to protest or oppose statutorily prohibited discrimination.  Thus, the Court focuses its analysis on Plaintiff Nelms' conduct in going to the Columbus Urban League to seek information about filing a housing discrimination charge.  This conduct obviously constituted a protected activity under § 3617.  Additionally, the Court notes that there is evidence that an employee at the Columbus

Urban League contacted Defendant Moreland on April 9, 2007, to inform her that Plaintiff Nelms was alleging discrimination by the apartment complex. Thus, there is evidence that Defendant Moreland was aware, as of April 9, 2007, that Plaintiff Nelms was pursuing a discrimination claim against the apartment complex.

Plaintiff Nelms asserts that Defendants Moreland and Mrs. Lagos retaliated against him, because he contacted the Columbus Urban League, by terminating his lease, threatening him by saying that "people out there got guns and are not afraid to use them," contacting the police, and requesting the police to enter his apartment. (Nelms Dep., p. 140).

Plaintiffs' retaliation claims fail for the following reasons. First, there is ample evidence in the record supporting a termination of Plaintiff Nelms' lease. Evidence demonstrates that persons who gathered at 4400 Shoupmill made disrespectful comments to tenants, that groups of people visiting this apartment frequently walked unreasonably close to other apartments, and that they visited and created disturbances at all hours of the day. For the reasons discussed above, Plaintiffs have not shown that these reasons were a pretext for an unlawful motivating basis. Second, the cited "gun" statement of Defendant Moreland that Plaintiff Nelms characterizes as a personal threat, when viewed in context, was a warning to him based on her observation that individuals who visited him would walk unreasonably close to other apartments and her apparent belief that such conduct could incite hostility by persons at the apartment complex who owned guns. Defendant Moreland did not suggest her approval of any such retaliation. Furthermore, this statement was made four days prior to the day on which the Columbus Urban League allegedly called Defendant Moreland and informed her that Plaintiff Nelms was going to seek a housing discrimination claim. Third, Defendant Moreland was justified in calling the police on

April 9, 2007, because she had been informed that there had been a disturbance at 4400 Shoupmill that resulted in property destruction. Fourth, because there had been property damage to the outside of the apartment, and because there was concern that one of the fight participants was injured and inside the apartment, it was reasonable for Defendant Tina Lagos to request the police to enter 4400 Shoupmill. That is, the damage to the property, and the concern that one of the fight participants was injured in the apartment, provided a non-retaliatory reason for her to ask the police to enter the apartment. Plaintiffs fail to show that this reason had no basis in fact, or was otherwise not credible.

For these reasons, the Court concludes that the Wellington Way Defendants are entitled to summary judgment on Plaintiffs' retaliation claims under § 3617.

### 2. Section 1983 Claim Against Wellington Way Defendants

Plaintiff Nelms presents § 1983 claims against the Wellington Way Defendants for unlawfully entering and searching his apartment on April 9, 2007. The Wellington Way Defendants argue that they are entitled to summary judgment on Plaintiff's Fourth Amendment claims under § 1983. In particular, these defendants argue in part that their conduct relating to the entry and search of Plaintiff Nelms' apartment is not "fairly attributable to the state," and therefore the § 1983 claims against them fail.

As discussed above, to state a claim under Section 1983, a plaintiff must allege that the defendant acted under color of state law to deprive the plaintiff of a right secured by the constitution or a federal statute. *Cassady*, 938 F.2d at 695. Section 1983 is directed at actions taken pursuant to governmental authority, and "does not, as a general rule, prohibit the conduct of private parties acting in their individual capacities." *Garcia v. Dykstra*, 260 F. App'x 887, 893

37

(6th Cir. 2008) (quoting *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 827 (6th Cir. 2007)).

Private actors may be liable, however, as agents of the government when their conduct is "fairly

attributable to the state." *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 636 (6th Cir. 2005)

(internal quotation marks omitted). Private conduct is actionable under § 1983 if it is: (1) the

exercise of a public function; (2) the result of state compulsion; or (3) a result of a symbiotic

relationship or nexus between the government and a private party. *See Chapman v. Higbee Co.*,

319 F.3d 825, 833 (6th Cir. 2003).

Furthermore, if a private party has conspired with state officials to violate constitutional

rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983. *Cooper*

*v. Parrish*, 203 F.3d 937, 952 n.2. (6th Cir. 2000) (citing *Wyatt v. Cole*, 504 U.S. 158, 168-69

(1992)); *Memphis, Tennessee Area Local, American Postal Workers Union, AFL-CIO v. City of*

*Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). In this way, liability under Section 1983 may be

imputed to private actors if there is concerted action between state and the private actors.

> A civil conspiracy is an agreement between two or more persons to injure another
> by unlawful action. Express agreement among all the conspirators is not necessary
> to find the existence of a civil conspiracy. Each conspirator need not have known
> all of the details of the illegal plan or all of the participants involved. All that must
> be shown is that there was a single plan, that the alleged coconspirator shared in
> the general conspiratorial objective, and that an overt act was committed in
> furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Thus, to show the existence of a civil

conspiracy, a plaintiff must show that (1) a single plan existed, (2) the conspirators shared a

conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act

was committed. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007).

"Rarely in a conspiracy case will there be direct evidence of an express agreement among

38

all the conspirators to conspire, [therefore,] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).  Consequently, for summary judgment purposes, "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Robinson v. Township of Waterford*, 883 F.2d 75, 79 (6th Cir. 1989) (internal citations omitted).

Here, the evidence demonstrates that at least one of the Wellington Way Defendants, Tina Lagos, expressed to Defendant Fleming a desire to investigate the inside of Plaintiff Nelms' apartment, and that Defendant Fleming decided to enter the apartment based on his assessment of the facts before him.  However, Plaintiff Nelms has failed to present direct or indirect evidence that Tina Lagos, or any of the other Wellington Way Defendants, formed an agreement, express or implied, with government officials to violate Plaintiff Nelms' constitutional rights.  Without such a "meeting of the minds," there can be no conspiracy.  That is, while there is evidence that Tina Lagos acquiesced in, and even encouraged, the officer's entry into Plaintiff Nelms' apartment, there is no evidence that any private party acted in concert, or conspired, with a government official in effecting a deprivation of constitutional rights.  Furthermore, the Wellington Way Defendants exerted no control over the officers; the officers made the independent determination that one or both of them should enter the apartment to search for a possibly injured person.  As there is no evidence of an agreement, one must conclude that the parties acted independently.

In sum, the government officials were not acting in furtherance of an agreement or

39

understanding with the private parties when one or both entered the apartment and searched for

Plaintiff Nelms and possibly also searched for contraband.  Contrary to Plaintiffs' arguments, a

conspiracy to deprive Plaintiff Nelms of his constitutional rights cannot reasonably be inferred

from the evidence.  For these reasons, the Wellington Way Defendants are entitled to summary

judgment on Plaintiffs' § 1983 claims against them.

3.     Ohio Rev. Code § 5321.04 Claim

Plaintiff Nelms alleges that one or more of the Wellington Way Defendants entered his

apartment, in the absence of an emergency, without providing reasonable notice in violation of

Ohio Revised Code § 5321.04(A)(8), which provides as follows:  "Except in the case of

emergency or if it is impracticable to do so, give the tenant reasonable notice of his intent to enter

and enter only at reasonable times.  Twenty-four hours is presumed to be a reasonable notice in

the absence of evidence to the contrary."  If a landlord violates this provision, the "tenant may

recover actual damages resulting from the entry or demands, obtain injunctive relief to prevent the

recurrence of the conduct, and obtain a judgment for reasonable attorney's fees, or may terminate

the rental agreement."  Ohio Rev. Code § 5321.04(B).

The Wellington Way Defendants, citing the exceptions set forth in § 5321.04(A)(8), argue

that Defendants Shirley Moreland and Tina Lagos faced an emergency situation that required

entry into Plaintiff Nelms' apartment without first providing notice.  Similarly, these Defendants

argue that the circumstances made it impracticable to provide reasonable notice before entering

Plaintiff Nelms' apartment.  These Defendants also argue that Plaintiff Nelms does not have a

valid claim under this statute because he has failed to present evidence that he incurred actual

damages due to the entry into his apartment.

40

It is undisputed that the Wellington Way Defendants did not provide reasonable notice to Plaintiff Nelms before one of the landlord's employees, Steve Shump, allegedly entered the apartment before the police arrived.  However, as outlined above, evidence demonstrates the existence of exigent circumstances justifying immediate action.  Furthermore, even if an emergency situation did not exist, the Wellington Way Defendants are correct in asserting that Plaintiff Nelms' claim under this statute fails because he has not established any actual damages as a result of the entry into Plaintiff Nelms' apartment.  As outlined above, § 5321.04(B) provides that, if a landlord unlawfully enters, the tenant may "recover actual damages . . . obtain injunctive relief to prevent the recurrence of the conduct, and obtain a judgment for reasonable attorney's fees, or may terminate the rental agreement."

In the case at bar, Plaintiff Nelms seeks damages and attorney's fees as a result of the alleged violation of this statute; he obviously cannot seek injunctive relief or to terminate the rental agreement because the lease has been terminated and he vacated the apartment.  But the statute limits recovery to "actual damages" which are "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses."  Black's Law Dictionary (9th ed. 2009).  The statute does not authorize a court to award nominal damages, even though such an award would be available in a common law trespass action.  *See, e.g.*, *Meacham v. Miller*, 606 N.E.2d 996, 999 (Ohio Ct. App. 1992) (noting that a court will award nominal damages in a common law trespass action if a tenant cannot prove actual damages resulting from a landlord's unlawful actions).  Thus, in an action to recover damages under this statute, the plaintiff must demonstrate actual damages.  Otherwise, the claim is not viable.

Plaintiff Nelms presents his claim under the Ohio statute and does not pursue a common

law claim of trespass.  Because Plaintiff Nelms has not presented evidence of actual damages in

support of his statutory claim, the Court cannot award any recovery.  Furthermore, because

Plaintiff Nelms has presented no evidence of actual damages, an award of attorney's fees would

be inappropriate.  *Meacham*, 606 N.E.2d at 1000 (noting that, before a court awards attorney's

fees under Ohio Rev. Code 5321.04, the tenant must first prove actual damages).

Accordingly, the Wellington Way Defendants are entitled to summary judgment on

Plaintiff Nelms' claim under Ohio Rev. Code § 5321.04(B).

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Wellington Way Defendants Motion

for Summary Judgment (Doc. 32), and also **GRANTS** the Columbus Defendants' Motion for

Summary Judgment (Doc. 30).

The Clerk shall remove Documents 30 and 32 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.


**IT IS SO ORDERED.**

*s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**